B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CRUSADER OFFSHORE PARTNERS, L.P., et al., | § § § § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. 3:08-CV-0102-B |
| | § | |
| LIFECARE HOLDINGS, INC., et al., | § § § | |
| Defendants | § | |

## MEMORANDUM ORDER

Before the Court is Plaintiff's Motion to Remand and Memorandum in Support (doc. 7). The Court **DENIES** the Motion to Remand for the reasons that follow.

### I. Background

Defendant LifeCare Holdings, Inc. ("LifeCare"), which operates acute care hospitals in several states, is owned and operated by The Carlyle Group, a global private equity firm. (Pls.' Pet. 5-6). On August 11, 2005, Rainier Acquisition Corp. purchased LifeCare for $552 million. (*Id.* at 6). Related to this transaction, LifeCare borrowed $255 million under a senior credit facility. (*Id.*). A Credit Agreement ("Credit Agreement") dated August 11, 2005 sets out the terms of this senior credit facility. (*Id.*). The parties to this Credit Agreement are (1) The Defendant borrowers consisting of LifeCare and LCI Holdco, LLC ("LCI"); (2) the lenders consisting of, among others, the Plaintiffs in this action; and (3) Defendant JPMorgan Chase Bank, N.A. ("JPMorgan"), which is the administrative and collateral agent and also a lender. (*Id.*). The Plaintiff lenders in this

transaction consist of Highland Crusader Offshore Partners, L.P. (a Bermudan limited partnership with its principal place of business in Bermuda) and several other lenders with their principal places of business in Texas: Highland Credit Strategies Funds; Highland Distressed Opportunities, Inc.; Highland Floating Rate Advantage Fund; Restoration Opportunities Funds; Highland Credit Opportunities Fund CDO, L.P.; and Highland Funds I. (*Id.* at 3). Plaintiff Highland Capital Management, L.P., ("HCM") an investment adviser, manages the other Plaintiff lenders. (*Id.*). The Plaintiff lenders are collectively referred to as "the Highland Funds." The Highland Funds own approximately 53.8% of the outstanding term loans. (*Id.* at 6). The next largest lender, Credit Suisse, which is not a party to this action, owns approximately 6.8% of the outstanding term loans. (*Id.*). Eaton Vance, another non-party, owns more than 5% of the outstanding term loans. (*Id.* at 6-7). Approximately 18 other non-party lenders own less than 5% of the outstanding term loans. (*Id.* at 7). In April 2007, the Highland Funds consented to the First Amendment of the Credit Agreement, and they and other consenting lenders received an amendment fee to be paid by the borrower to the consenting lenders. (*Id.* at 7-8). When a Second Amendment to the Credit Agreement was proposed in November 2007, the Highland Funds did not consent. (*Id.* at 9). According to the Plaintiffs, the Defendants, contrary to the industry practice, secretly offered an enhanced amendment fee to other lenders, but excluded the Highland Funds from this offer. (*Id.* at 10-12).

On December 21, 2007, based on these allegations, the Plaintiffs filed this action in the 191st Judicial District Court of Dallas County, Texas alleging breach of contract (the Credit Agreement), breach of the duty of good faith and fair dealing, fraud, negligent misrepresentation, aiding and abetting fraud, and conspiracy to commit fraud. (*Id.* at 12-17). On January 22, 2008, Defendant

JPMorgan filed a notice of removal, consented to by all other Defendants, pursuant to 12 U.S.C. § 632. (doc. 1). The Plaintiffs filed the instant motion to remand on February 2, 2008. (doc. 7). The Defendants replied on February 25, 2008, and the Plaintiffs replied on March 11, 2008. Thus, the motion to remand is ripe for disposition.

## II. Analysis

### A. Legal Standard

Because the jurisdiction of the federal courts is limited, a federal court must presume that a suit falls outside its jurisdiction. *See Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). The party invoking federal jurisdiction has the burden of establishing it. *Id.* In the removal context, this is the removing party. *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir. 1995). All doubts and ambiguities concerning the propriety of removal must be resolved against removal and in favor of remand. *See Manguno v. Prudential Prop. and Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002).

### B. 12 U.S.C. § 632

12 U.S.C. § 632, also referred to as the Edge Act, provides:

> Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking . . . or out of other international or foreign financial operations . . . shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits; and any defendant in any such suit may, at any time before the trial thereof, remove such suit from a State court into the district court of the United States for the proper district by following the procedure for the removal of causes otherwise provided by law.

Thus, in order for this Court to exercise jurisdiction over this case pursuant to the Edge Act, the Defendants must satisfy two requirements: (1) a corporation organized under the laws of the United States must be a party to the action and (2) the action must arise out of transactions involving

international or foreign banking or other international or foreign financial operations. *Bank of America Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 213 (S.D.N.Y. 2005)(citation omitted). In determining whether the Defendants have met the second requirement, the Court considers whether the lawsuit arises out of transactions that are (a) foreign and (b)either banking transactions or financial operations. *Pinto v. Bank One Corp.*, 2003 WL 21297300, at *3 (S.D.N.Y. 2003). The Plaintiffs concede that the Defendants have satisfied the first prong because Defendant JPMorgan is a national bank organized under the laws of the United States; therefore, the Court need only consider the second prong–whether the action arises out of international or foreign banking or financial operations. (Pls.' Mot. 8).

        *1.*     *Does this lawsuit arise out of a foreign or international transaction?*

The Plaintiffs do not contest that their state law claims arise out of the Credit Agreement; their claims include an allegation that the Defendants have breached the Credit Agreement (Pls.' Mot. 2 ("The financial agreement at the heart of this lawsuit is a Credit Agreement . . ."). Therefore, the Court must determine whether this Credit Agreement was a transaction that was (a) foreign and (b) involved banking or financial operations. One of the Plaintiff lenders, Highland Crusader Offshore Partners, L.P., ("Highland Crusader"), is a Bermudan limited partnership with its principal place of business in Bermuda. (Pls.' Pet. 3). According to the Defendants, it is undisputed that Highland Crusader is a party to the Credit Agreement and made loans to LifeCare. (Defs.' Resp. 8). The Plaintiffs have taken an inconsistent position on this point. In their Petition, the Plaintiffs stated: (1) "The terms of the $255 million senior credit facility are set forth in the Credit Agreement dated August 11, 2005, between LifeCare and LCI (the "Borrowers"), the lenders from time to time that are party thereto (the "Lenders"), and JPMorgan Chase." (Pls.' Pet. 6) and

(2) "Plaintiffs and Defendants are parties to the Credit Agreement." (*Id.* at 12). In their Motion to Remand, the Plaintiffs stated, "The financial agreement at the heart of this lawsuit is a Credit Agreement negotiated and executed between Defendants LifeCare and LCI, located in Plano, Texas, on one hand, and Defendant JPMorgan as agent bank, on the other hand. As such, the Credit Agreement is an agreement between domestic entities with no relation to foreign banking or financial operations." (Pls.' Mot. 2). However, two pages later, Plaintiffs state "The terms of the $255 million senior credit facility are set forth in a Credit Agreement dated August 11, 2005, to which both Plaintiffs and Defendants are parties." (*Id.* at 4). The Plaintiffs also refer to the "Plaintiffs' contractual agreement with defendants." (*Id.* at 12). Despite the Plaintiffs' inconsistent statement, the Court concludes that the Plaintiffs (including Highland Crusader) are parties to the Credit Agreement on which they are suing.

Having determined that the transaction giving rise to the dispute is a Credit Agreement among a number of lenders ( at least one of which is a Bermudan limited partnership), American borrowers, and an American bank, the Court's next task is to determine whether this transaction should be characterized as foreign or international. In *Stamm* , the court characterized the sale of securities between a British issuer and American investors as international. *Stamm v. Barclays Bank of New York*, 960 F. Supp. 724, 728 (S.D.N.Y. 1997).[1] The Court finds that the presence of a

---

[1]That only one of the plaintiff lenders is a foreign company should not prevent the transaction from being characterized as international. See *Pinto*, 2003 WL 21297300 at * 3 (holding that the credit card transactions at issue were "foreign" for purposes of § 632 when a small number of them used a non-party bank located in Bermuda as a merchant bank). In addition, according to the Defendants, at least four other foreign lenders (who are not parties to this case) were parties to the Credit Agreement. (Defs.' Br. 3). While the Court expresses no opinion on whether it may consider the foreign companies who are not parties to this suit in its analysis of whether the transaction is foreign, there is authority that suggests that it can. *Pinto*, 2003 WL 21297300 at * 3 (considering that a non-party Bermudan bank acted as a merchant bank in its analysis of whether the transaction was foreign); Steven M. Davidoff, Section 632: An Expanded Basis of Federal

Bermudan partnership as a lender makes this an international transaction.

The Plaintiffs argue that Highland Crusader has no employees, that HCM made all the investment decisions for Highland Crusader in Texas, that the credit agreement was executed in the U.S. and is governed by New York law, and that all communications regarding the agreement were conducted in the U.S. (Pls.' Mot. 5-6). In *CVF*, the Second Circuit held that a transaction in which a New York corporation in New York drew on a letter of credit on the account of a Venezuelan corporation involved international or foreign banking. *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 793 (2d Cir. 1980); *see also* Davidoff, *supra* note 1, at 692-93 ("In CVF, the Second Circuit upheld federal jurisdiction under Section 632 even though . . . the banking transaction on which Section 632 jurisdiction was premised – namely, the draw-downs of the letters of credit by the New York corporation –took place entirely in the United States."); Robert M. Brill & James J. Bjorkman, Federal Court Jurisdiction Over International Banking Transactions, 110 BANKING L.J. 118, 126 (March-April 1993) ("Apparently, the [CVF] court concluded that the mere presence of the foreign account party in the otherwise purely domestic banking transaction was sufficient to confer federal jurisdiction."). Based on *CVF*, the Court finds that the fact that the underlying transaction took place entirely within the United States does not preclude a finding of foreign character.

The Plaintiffs also argue that § 632 should not apply because the fact that Highland Crusader is a foreign company is irrelevant to the Plaintiffs' claims. (Pls.'s Mot. 2 ( "Nothing about Plaintiffs' case turns on the mere fortuitous fact that one fund is foreign."); Pls.' Mot. 8 ("[T]here

---

Jurisdiction for National Banks, 123 BANKING L.J. 687, 699 (September 2006) ("The Lloyd's Cases also show that Section 632 jurisdiction may be invoked even when no party is foreign.").

is no foreign component to Plaintiffs' lawsuit."); Pls.' Mot. 9 ("Plaintiffs' claims do not arise out of or relate to, the fact that Crusader, which is managed in Dallas, Texas, is based off-shore."). Section 632 does not require that the claims themselves have a foreign character; it only requires that the lawsuit "arise out of" transactions with a foreign aspect.[2] Indeed, courts have upheld jurisdiction under Section 632 "even though the international or foreign banking activity was not central to the case." *In re Lloyd's Am. Trust Fund Litig.*, 928 F. Supp. 333, 340 (S.D.N.Y. 1996) (citations omitted); *see also Conitrade Services Corp. v. Eddie Bauer, Inc.*, 794 F. Supp. 514, 517 (S.D.N.Y. 1992) (rejecting the argument that the case was a domestic matter involving only American companies because the account party on two of the letters of credit was a Canadian company).

*Racepoint Partners*, a case cited by the Plaintiffs, does not mandate remand of this case. *Racepoint Partners, LLC v. JPMorgan Chase Bank*, 2006 WL 3044416 (S.D.N.Y. 2006). That case involved claims arising from the defendant's alleged failure to perform its duties as indenture trustee for notes issued in 1999 and 2001. *Id.* at *1. The court found that the action based on the 1999 notes had a foreign component because the notes were issued in face values denominated in euros and the notes were to be paid in euros. *Id.* at *3. However the action based on the 2001 notes did not "arise out of" an international transaction because these notes were issued in U.S. dollars and had no international component. *Id.* The Court agrees with the proposition in *Racepoint Partners* that the action must arise out of the international transaction. Based on this case, the Plaintiffs claim:

---

[2]To the extent that *Telecredit* supports Plaintiffs' position that the lawsuit itself must be of an international nature, the Court, as discussed below, finds *Telecredit* distinguishable because it did not involve a foreign party to a contract and declines to follow that case. *Telecredit Serv. Ctr. v. First Nat'l Bank of the Fla. Keys*, 679 F. Supp. 1101 (S.D. Fla. 1988).

> Similarly, in this suit, Plaintiffs' claims do not "arise" out of HCM's management of a single offshore fund, but arise from Plaintiffs' contractual agreement with defendants. Since § 632 requires that the financial operation from which the suit "arises" be "international or foreign," § 632 does not provide jurisdiction over this contractual action.

(Pls.' Mot. 12). The Court agrees with the Plaintiffs that this suit does not arise out of HCM's management of an offshore fund but instead arises out of the Credit Agreement among the Plaintiff lenders, the Defendant borrowers, and the Defendant bank. At least one of these lender parties to the Agreement is a foreign company. Therefore, this action arises out of an international transaction. Having determined that the transaction is international, the Court will now turn to whether it involves banking transactions or other financial operations.

2. *Does this transaction involve banking or financial operations?*

Courts have interpreted the term banking transaction to encompass traditional banking activities. *Consorcio de Fomento Indus. S.A., de C.V. v. First Nat'l Bank of Chi.*, 1993 WL 291706, at *3 (N.D. Ill. 1993) (citations omitted). Traditional banking activities include:

> the making and collection of loans, the issuance of documents evidencing loans (notes, guarantees), the opening and closing of checking accounts, the processing of checks, the filing of lawsuits for collection in event of default, the preparation of mortgage agreements, the foreclosure of mortgages, the issuance of letters of credit, the preparation of letters of guarantee, and participation in refinancing.

*Id.* (citations omitted). The Defendants contend that the loans made by the Plaintiffs through the Credit Agreement constitute the banking activities contemplated by § 632. (Defs.' Br. 7). Furthermore, JPMorgan has also engaged in a traditional banking activity by making loans under the Agreement. *Consorcio*, 1993 WL at *4 ("A loan is perhaps the oldest and most traditional of bank functions."); (Pls.' Pet. 6).

The Plaintiffs claim that remand is required because their claims are contractual in nature, are based on state law (as opposed to federal law), and do not involve foreign banking or financial operations. (Pls.' Br. 10). For this argument, the Plaintiffs cite *Telecredit*, 679 F. Supp. 1101. In that case, Telecredit Service Center, Inc. ("Telecredit") entered a contract with First National Bank of the Florida Keys ("First National") in which Telecredit would provide First National with technical assistance and would serve as the go-between for credit card transactions between Visa and Master Card, merchants, and First National. *Id.* at 1102. Telecredit alleged that First Bank established business relationships with two merchant depositors who had a high number of chargebacks (charges that the card holder's issuing bank declined to pay at the card holder's insistence). *Id.* The transactions in question involved the sale of travel club memberships in the Bahamas. *Id.* at 1103. Telecredit alleged fraud and misrepresentation. *Id.* at 1102. In considering the nature of the transaction at issue, the court found "the defendant's petition too tenuous to constitute a traditional banking transaction." *Id.* at 1104. It stated, "Rather, the court views the nature of the transaction at issue, i.e., the allocation of risk with respect to fraudulent chargebacks, as a contractual dispute between the parties." *Id.* The court went on to state, "The true nature of this action is contractual. The question to be resolved is which party is going to bear the loss occasioned by the apparent fraud." *Id.* The Court also questioned the foreign aspect of the transaction: "The potential liability does not stem from the supposed foreign aspect of the transaction, but from the alleged fraud of the domestic corporations. One could hardly say that the nature of the transaction was a transaction involving international banking merely because the service being purchased was to be consumed in a foreign land." *Id.* *Telecredit* is distinguishable because, unlike the instant case, *Telecredit* did not involve a foreign party to the contract. However,

the Court acknowledges that language from *Telecredit* could be used to support a requirement that the claim itself (as opposed to the underlying transaction from which it arises) have an international banking element.

The Plaintiffs also cite *Bank of New York* for the requirement that the claims themselves involve banking law issues. *Bank of New York v. Bank of America*, 861 F.Supp. 225, 232-33 (S.D.N.Y. 1994). In that case, after acknowledging that the lawsuit arose out of a failed loan, the court stated,

> The claims in those cases [in which § 632 jurisdiction was found] were integrally tied to banking activity, such that the courts were required to consider and apply principles of banking law to resolve them. This case, by contrast, presents no banking law issues. Despite its appearance of having arisen from a failed banking transaction, the case is essentially contractual and presents only the most elementary contract law issue: Did the parties reach a binding agreement?

*Id.* The court then concluded that the case was outside the scope of § 632 because it lacked banking law issues, and stated, "On its face, the statute only requires that a case arise out of a transaction involving foreign banking. I interpret this, however to mean that banking must be legally significant in the case." *Id.* at 233 ( citing *Telecredit,* 679 F. Supp. at 1104).

*Telecredit* and *Bank of New York* support the Plaintiffs' view that, despite its plain language requiring only that the underlying transaction involve foreign banking, the Edge Act requires that the lawsuit itself involve issues of foreign banking. However, these cases represent the minority view which has been criticized. In *In re Lloyd's*, the court distinguished *Telecredit* and questioned *Bank of New York:*

> The decision in *Bank of New York* is, in any event, inconsistent with the text of Section 632 and with other federal court decisions that have routinely applied Section 632, even in cases based on state law causes of action and containing only an incidental connection to banking law. *See Conjugal Soc'y Composed of Juvenal Rosa v. Chicago Title Ins. Co.*, 690 F.2d 1 (1st Cir. 1982)(finding jurisdiction under Section 632 because plaintiffs were alleged to have been fraudulently induced to refinance a

> mortgage, though complaint was based on allegations of negligence and conspiracy, and hence bore no relationship to banking); *Cutler* [*v. Bank of America Nat'l Trust & Sav. Ass'n*], 441 F. Supp. 863 [N.D. Cal. 1977] (claims of negligence, fraud, conversion, breach of fraud, breach of warranty and contract, and negligent infliction of emotional distress arising from robbery of safety deposit box in foreign bank); *Puerto Rico v. Eastern Sugar Assoc.*, 156 F. 2d 316 (1st Cir.), *cert. denied*, 329 U.S. 772, 67 S.Ct. 190, 91 L.Ed. 664 (1946) (petition to condemn 3,000 acres of land where bank held mortgage); *Rose Hall Ltd. v. Chase Manhattan Overseas Banking Corp.*, 494 F. Supp 1139 (D. Del. 1980) (breach of contract and breach of fiduciary duty asserted against bank mortgagee of plaintiffs).

*In re Lloyd's*, 928 F.Supp. at 340-41; *see also Lemgruber*, 385 F. Supp. 2d at 214 (quoting *In re Lloyd's*, 928 F. Supp. at 340) (not criticizing *Telecredit* or *Bank of America* but stating, "[F]ederal courts in this Circuit have consistently interpreted the Edge Act's jurisdictional provision broadly, 'routinely apply[ing] Section 632, even in cases based on state law causes of action and containing only an incidental connection to banking law,' and 'even though the international or foreign banking activity was not central to the case.'"); *Pinto*, 2003 WL 21297300 at *3 n.5, *5 (quoting *In re Lloyd's*, 928 F. Supp. at 341 (quoting *Bank of New York*, 861 F. Supp. at 233)) (distinguishing *Telecredit* and stating "As Judge Sweet concluded in *In re Lloyd's*, it is not necessary to resolve this issue (of whether *Bank of New York* is truly consistent with the text of the Edge Act): whether we look simply for the presence of banking activities, or we require that 'the banking aspect of the jurisdictional transaction must be legally significant in the case,' the result is the same." ); Gen. *Star Indem. Co. v. Platinum Indem. Ltd. Bank of America*, 2001 WL 40763, at *2 (S.D.N.Y. 2001) (quoting *In re Lloyd's*, 928 F. Supp. at 338) (not discussing *Telecredit* and *Bank of New York* but stating that "a suit satisfies the jurisdictional requisites of Section 632 if any part of it arises out of transactions involving international or foreign banking.").

Commentators have also weighed in on this issue and expressed disapproval of *Telecredit and*

*Bank of New York*:

> [T]hese [*Telecredit* and *Bank of New York*] decisions offer a constricted interpretation of Section 632 that stands at odds with CVF, Juvenal Rosa and the bulk of case law interpreting Section 632. Indeed, to the extent that these decisions impose additional requirements for establishing jurisdiction under Section 632 (such as the presence in the case of "banking law issues"), they also appear to stand at odds with the statute itself.

Davidoff, *supra* note 1, at 695. *See also* " Joseph DeSimone & Henninger S. Bullock, On the Edge of the Federal Court, 235 NEW YORK L.J. (February 2006) (citations omitted) ("An early line of cases, led by Bank of New York v. Bank of America, espouses the minority view that courts should interpret §632 narrowly. . . Since 1994, however, numerous courts have criticized the narrow holding in Bank of New York as inconsistent with both 'the text of Section 632 and with other federal court decisions that have routinely applied Section 632.'" );  Brill, *supra*, at 124  ("Despite the *Telecredit* court's restrictive view, other courts have gradually broadened the type of activities that fall within the scope of banking activities under Section 632.").

Based on the plain language of the statute and the authorities cited above, the Court concludes that it unlikely that the Edge Act requires that the lawsuit itself (as opposed to the underlying transaction) have a significant relationship with banking issues. Furthermore, this case is distinguishable from *Bank of New York* because it does not simply require the Court to determine whether there was a valid contract. Instead, this lawsuit is based on the exclusion of some lenders from an offer for an enhanced amendment fee. The Plaintiffs claim that the Defendants breached duties associated with the loans and acted contrary to the standard industry practice; therefore, the Court will be required to consider the duties associated with loan agreements and the standard practice for offering amendment fees in the lending industry. (Pet. 10, 12). Accordingly, the claims in this case have more of a connection to banking transactions and financial operations than the

claims in *Bank of New York*.

Finally, the Plaintiffs' argument that § 632 should not apply because their claims are state law contract claims is without merit. While there is limited authority addressing the Edge Act within the Fifth Circuit, the one case that this Court has located rejects this notion. *ABA Int'l v. Citicorp USA*, 1988 WL 30637, at *1 (S.D. Tex. 1988) (finding federal jurisdiction under § 632 when the complaint alleged state law tort and contract claims); *see also Lemgruber*, 385 F. Supp. 2d at 215-16 (holding that a breach of contract claim satisfied the requirements of § 632). The Defendants have established that the underlying transaction involved banking or financial operations. Accordingly, this Court has jurisdiction over this action pursuant to the Edge Act, and the Plaintiffs' Motion to Remand is **DENIED**.

### III. Conclusion

For the reasons stated above, the Court **DENIES** the Plaintiffs' Motion to Remand.

**SO ORDERED.**

**SIGNED May 15, 2008**

_____
**JANE J. BOYLE
UNITED STATES DISTRICT JUDGE**