UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CRUSADER OFFSHORE PARTNERS, L.P., et al., | § § § | |
| Plaintiffs, | § | |
| v. | § § | CIVIL ACTION NO. 3:08-CV-0102-B |
| LIFECARE HOLDINGS, INC., et al., | § § | |
| | § | |
| Defendants | § | |

## MEMORANDUM ORDER

Before the Court is Defendants' Motion to Dismiss Plaintiffs' Complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6). (doc. 15). For the reasons that follow, the Court **GRANTS** the

Motion to Dismiss the Plaintiffs' breach of contract, breach of the duty of good faith and fair dealing,

and aiding and abetting fraud claims and **DENIES** the Motion to Dismiss the Plaintiffs' fraud,

negligent misrepresentation, and conspiracy to commit fraud claims.

## I. Background

Defendant LifeCare Holdings, Inc. ("LifeCare"), which operates acute care hospitals in

several states, is owned and operated by The Carlyle Group, a global private equity firm. (Pls.'

Original Pet. ("Pet.") 5-6). On August 11, 2005, Rainier Acquisition Corp. purchased LifeCare for

$552 million. (*Id.* at 6). Related to this transaction, LifeCare borrowed $255 million under a senior

credit facility. (*Id.*). A Credit Agreement ("Credit Agreement") dated August 11, 2005 sets out

the terms of this senior credit facility. (*Id.*). The parties to this Credit Agreement are (1) the

Defendant borrowers consisting of LifeCare and LCI Holdco, LLC ("LCI"); (2) the lenders consisting of, among others, the Plaintiffs[1] in this action; and (3) Defendant JPMorgan Chase Bank, N.A. ("JPMorgan"), which is the administrative and collateral agent and also a lender. (*Id.*). At the time of the transaction at issue, the Plaintiffs owned approximately 53.8% of the outstanding term loans. (*Id.* at 6).

In April 2007, LifeCare sought to amend the Credit Agreement. (*Id.* at 7). A draft of the first amendment of the Credit Agreement was sent to all of the lenders via a secure digital workspace known as "Intralinks." (*Id.*). All of the written proposals with respect to the first amendment were exchanged between LifeCare, JPMorgan, and all of the lenders through Intralinks. (*Id.*). According to the Plaintiffs, "virtually all amendments to a credit agreement include an amendment fee to be paid by the borrower to the consenting lenders." (*Id.*). The first amendment provided that the borrower would pay each Lender that executed the amendment by April 30, 2007 an amendment fee equal to "0.25 % of the aggregate Revolving Commitments and Term Loan Commitments of each such lender." (*Id.* at 8). Under the Credit Agreement, lenders "representing more than 50% of the sum of the total Revolving Exposures, outstanding Term Loans and unused Commitments" were required to consent to the amendment before it became effective. (*Id.*). The Plaintiffs and other lenders consented to the first amendment and received their amendment fees. (*Id.*).

In November 2007, all of the lenders were invited to participate in a conference call to

---

[1] The Plaintiff lenders in this transaction consist of Highland Crusader Offshore Partners, L.P.; Highland Credit Strategies Funds; Highland Distressed Opportunities, Inc.; Highland Floating Rate Advantage Fund; Restoration Opportunities Funds; Highland Credit Opportunities Fund CDO, L.P.; and Highland Funds I. (Pls.' Pet. 3). These parties will collectively be referred to as the Plaintiffs. Defendants LifeCare Holdings, Inc.; LCI Holdco, LLC ; and JPMorgan Chase Bank, N.A. will collectively be referred to as the Defendants.

discuss a second proposed amendment of the Credit Agreement. (*Id.*). Materials related to this conference call were circulated on Intralinks. (*Id.*). The proposed amendment sought to "increase the interest coverage and net leverage ratios on the Revolver and Term Loans and to increase Carlyle's existing equity rights to cure certain defaults or covenant breaches by the Borrowers." (*Id.* at 9). In return, the borrowers proposed an increase in the initial pricing on the Revolver and Term Loan positions by 50 basis points ("bps"). In addition, each consenting lender would receive an amendment fee of 25 bps of the aggregate Revolving Commitments and Term Loan Commitments of each such lender. (*Id.*). The Plaintiffs did not consent to this amendment. (*Id.*).

On December 5, 2007, JPMorgan circulated a revised proposal and posted it on Intralinks. (*Id.* at 9). This revised proposal offered an enhancement from 50 bps to 100 bps in the increase in the initial price and an increase in the amendment fee from 25 bps to 75 bps. (*Id.*). Instead of offering this amendment fee to all consenting lenders who consented to the amendment by a certain date, the proposal stated, the "Company will be accepting consent signature pages **until the required >50% vote is achieved and subsequent consents will not be accepted nor will amendment fees be paid**." (*Id.* at 10 (emphasis in original)). The Plaintiffs did not consent to this revised proposal. (*Id.*). The Defendants offered an enhanced amendment fee of 125 bps to some of the lenders but did not include the Plaintiffs in this offer. (*Id.*). This offer was never posted on Intralinks. (*Id.*). The proposed amendment received the requisite 50% lender approval and the consenting lenders were paid 125 bps. (*Id.* at 11). The Plaintiffs claim that if they had been aware of the enhanced amendment fee, they would have immediately approved it and that if they had been aware that the other lenders were offered the enhanced amendment fee, they would have immediately approved the amendment at 75 bps. (*Id.*). The CEO and CFO of LifeCare confirmed that LifeCare had

knowingly and intentionally not provided the enhanced amendment fee offer to the Plaintiffs. (*Id.*).

On December 21, 2007, based on these allegations, the Plaintiffs filed this action in the 191st Judicial District Court of Dallas County, Texas alleging breach of contract (the Credit Agreement), breach of the duty of good faith and fair dealing, fraud, negligent misrepresentation, aiding and abetting fraud, and conspiracy to commit fraud. (*Id.* at 12-17). They claim they are entitled to 125 bps on $134,539,351.79 in outstanding Term Loans ($1,681,741.90) plus attorneys fees and costs, prejudgment interest, and exemplary and punitive damages. (*Id.* at 12). On January 22, 2008, Defendant JPMorgan filed a notice of removal, and on May 15, 2008, this Court denied the Plaintiffs' Motion to Remand. (doc. 20). The Defendants filed their Motion to Dismiss on April 9, 2008 (doc. 15). The Plaintiffs filed a Response on May 9, 2008[2] (doc. 19), and the Defendants filed their Reply on May 27, 2008 (doc. 23). The Motion to Dismiss is thus ripe for disposition.

## II. Analysis

### A. Legal Standard

In analyzing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, the Court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted. *Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004). A 12(b)(6) motion to dismiss should be granted only if the complaint does not include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). The

---

[2]The Court granted the Defendants an extension of time to file their Response (doc. 18).

Court's review is limited to the allegations in the complaint and to those documents attached to a defendant's motion to dismiss to the extent that those documents are referred to in the complaint and are central to the claims. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

**B.     Choice of Law**

In deciding on the law to apply with respect to the parties' state-based claims, the Court applies the choice-of-law rules of the forum state, here being Texas. *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004). The parties appear to agree that New York law should govern the Plaintiffs' breach of contract and breach of the duty of good faith and fair dealing claims and that Texas law should govern the Plaintiffs' fraud, negligent misrepresentation, aiding and abetting fraud, and conspiracy to commit fraud claims. (Mot. to Dismiss ("Mot.") 9 n.3, 19 & n.7; Resp. 6, 19). Under Texas law, if the parties have agreed to an enforceable choice of law clause, the court will apply the law of that state to contract claims. *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318 (5th Cir. 1992). Section 9.09 of the Credit Agreement[3] provides, "This Agreement shall be construed in accordance with and governed by the law of the State of New York." (Defs.' App. 128). Accordingly, the Court agrees with the parties that New York law governs the breach of contract and breach of the duty of good faith and fair dealing claims.

The Court will consider the following factors when applying choice of law principles to tort cases: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury

---

[3]The Court may consider the Credit Agreement provided in the Appendix to the Defendants' Motion to Dismiss because it is referred to in the Plaintiff's petition and is central to the Plaintiffs' claims. *Causey*, 394 F.3d at 288.

occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971); *Gutierrez v. Collins*, 583 S.W.2d 312, 318-19 (Tex. 1979)). According to the Plaintiffs' petition, and undisputed by the Defendants, "all or substantially all of the events giving rise to this litigation occurred in Dallas County, Texas." (Pet. ¶ 16; Mot. 19). In addition, many of the Plaintiffs as well as Defendants LifeCare and LCI have their principal places of business in Texas. (Pet. ¶¶ 3-9, 12-13). Therefore, the Court agrees that Texas law shall apply to the fraud, negligent misrepresentation, aiding and abetting fraud, and conspiracy to commit fraud claims. Having determined the choice of law, the Court will now turn to the Defendants' arguments in support of their Motion to Dismiss the breach of contract and duty of good faith and fair dealing claims.

### C. Breach of Contract and Duty of Good Faith and Fair Dealing

The Plaintiffs' breach of contract claims include (1) failing "to give Plaintiffs notice of the Enhanced Agreement Fee as required by § 9.01 of the Credit Agreement;" (2) furnishing "information to Plaintiffs in connection with the negotiation of Amendment No. 2 to the Credit Agreement that was misleading" in violation of Section 3.12 of the Credit Agreement; and (3) breach of "their equitable covenants to deal with Plaintiffs, as Lenders, fairly and in a manner that is consistent with the standard industry practice and course of dealing between the parties" in violation of Section 3.02 of the Credit Agreement. (Pet. ¶¶ 43-45). The Defendants move to dismiss these claims because (1) the Plaintiffs have failed to identify any express contract provisions that the Defendants have breached; (2) the contract is unambiguous; and (3) the Plaintiffs may not use

custom and usage or industry practice to alter/amend this unambiguous contract. (Mot. 10-14). The Court will begin with the contract claims with respect to Sections 9.01 and 3.12 of the Credit Agreement. A review o f the language of these provisions makes it clear that the Defendants have not breached these provisions.

### 1. Section 9.01

Section 9.01 (a) provides:

> Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications *provided for herein* shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows. . .

(Defs.' App. 118) (emphasis added). According to the Plaintiffs, this provision required the Defendants to give them notice of the enhanced amendment fee and failure to do so constituted a breach. However, as the Defendants point out, this provision applies to notices provided for by the Credit Agreement. (Reply 3). The Plaintiffs do not point to any provision in the Credit Agreement that requires notice of offers of amendment fees or of negotiations of amendments between the borrowers and lenders. The Defendants have not failed to give any notice that is required by the Credit Agreement; therefore, the Plaintiffs' claim for breach of Section 9.01 should be dismissed. The Plaintiffs' statement that section 9.02 requires actual amendments to the Credit Agreement (as opposed to offers or negotiations regarding amendments to the Credit Agreement) to be in writing does not save the Plaintiffs' claim. (Resp. 4). The Defendants' Motion to Dismiss the Plaintiffs' claim for breach of Section 9.01 is **GRANTED.**

### 2. Section 3.12

The Plaintiffs' claim that the Defendants breached Section 3.12 likewise fails. Section

3.12 provides:

> Neither the Information Memorandum nor any of the other written reports, financial statements, certificates or other written information, taken as a whole, furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender *in connection with the negotiation of this Agreement or any other Loan Document* or delivered hereunder or thereunder (as of the date thereof and as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; <u>provided</u> that, with respect to information of a general economic nature, estimates and projected financial information, Holdings and the Borrower represent only that such information was prepared in good faith based upon assumptions believed to be reasonable (I) at the time such projected financial information was prepared, (ii) on the date of the Information Memorandum and (iii) as of the date hereof (it being understood that actual results may vary materially from such projected financial information).

(Defs.' App. 77 (emphasis added)).

The Plaintiffs claim that the Defendants furnished "information to Plaintiffs in connection with the negotiation of Amendment No. 2 to the Credit Agreement that was misleading." (Pet. ¶ 45). Section 3.12 applies to information in connection with "the negotiation of this Agreement or any other loan document," not negotiation of *amendments* to the Credit Agreement. Loan document is defined as "this Agreement, the Guaranties, the Assumption Agreement and the Security Documents." (Defs.' App. 31). Even assuming that the Defendants furnished misleading information, this misleading information was furnished in connection with the negotiation of the amendment of the Agreement and not the Agreement itself or other loan documents. Accordingly, the Defendants' Motion to Dismiss the Plaintiffs' claim for breach of Section 3.12 is **GRANTED**.

*3. Section 3.02/Breach of Implied Covenant of Good Faith and Fair Dealing*

Finally, the Plaintiffs claim that the Defendants breached Section 3.02. The Court begins by noting, as pointed out by the Defendants, that the Plaintiffs' quotation of Section 3.02 omits a

significant portion of the provision and is rather misleading.  (Reply 2).  The Plaintiffs' quotation is "[t]ransactions entered into and to be entered into by each Loan Party are . . . subject to general principles of equity, regardless of whether considered in a proceeding at equity or at law, and implied covenants of good faith and fair dealing." (Resp. 6).  The entire provision provides:

> The Transactions entered into and to be entered into by each Loan Party are within such Loan Party's corporate, limited partnership or limited liability company powers, as applicable, and have been duly authorized by all necessary corporate, limited partnership or limited liability company and, if required, stockholder action.  This Agreement has been duly executed and delivered by each of Holdings and the Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of Holdings, the Borrower or such Loan party (as the case may be), enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding at equity or at law, and implied covenants of good faith and fair dealing.

(Defs.' App. 72).  The duty of good faith and fair dealing applies to the Agreement, not as the Plaintiffs claim, to the "transactions entered into and to be entered into by each Loan Party."  This provision incorporates the implied covenant of good faith and fair dealing.  The analysis would be the same whether the Court considers this claim as breach of an express provision of the contract (Section 3.02) or as a breach of the  implied covenant of good faith and fair dealing; therefore, the Court will consider these claims together.

In their petition, the Plaintiffs allege, "Defendants breached the express and implied covenant of good faith and fair dealing in the Credit Agreement.  Defendants acted in a manner that had the effect of destroying or injuring the right of Plaintiffs to receive the amendment fee with respect to the Second Amendment."   (Pet. ¶ 50).  The Defendants move to dismiss the breach of the implied covenant of good faith and fair dealing  because (1) no provision of the contract, when read together

with the covenant, "imposes an affirmative obligation on defendants which they have breached;" (2) the covenant cannot add a substantive provision not included in the contract; and (3) the covenant does not apply to amendments or future conduct  (Mot. 15-19).

Under New York law, the implied covenant of good faith and fair dealing provides that "'neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (quoting M/A-COM *Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)). "'[T]his covenant only applies where an implied promise is so interwoven into the contract 'as to be necessary for effectuation of the purposes of the contract.'  For this to occur, a party's action must directly violate 'an obligation that may be presumed to have been intended by the parties.'  However, 'the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract.'" *Id.* at 407-08 (quoting *Galesi*, 904 F.2d at 136).  The covenant may only be invoked when a party has "violated the spirit, although not the letter, of a contract."  *Harris Trust & Sav. Bank v. E-II Holdings, Inc.*, 926 F.2d 636,  642 (7th Cir. 1991) (citation omitted).  The test is whether the Plaintiffs are seeking to enforce "'promises which a reasonable person in the position of the [Plaintiffs] would be justified in understanding were included [in the Credit Agreement].'" *Id.* at 643 (quoting *Havel v. Kelsey-Hayes Co.*, 445 N.Y.S.2d 333 (N.Y. App. Div. 1981)) (other citation omitted).

The Court agrees with the Defendants' second argument that the implied covenant cannot create a new or inconsistent obligation and finds dismissal appropriate on that ground.  The covenant "is implied only where the implied term 'is consistent with other mutually agreed upon terms in the contract.'  In other words, the implied  covenant will only aid and further the explicit terms of the

agreement and will never impose an obligation "which would be inconsistent with other terms of the contractual relationship."" *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1517 (S.D.N.Y. 1989) (quoting *Sabetay v. Sterling Drug, Inc.*, 506 N.E.2d 919, 922 (N.Y. 1987)). In their petition, the Plaintiffs allege that the Defendants' actions destroyed their right to receive an amendment fee. However, the Credit Agreement does not provide for this right. Plaintiffs are attempting to use the implied covenant to create a right to an amendment fee or an obligation on the part of the Defendants to negotiate with or notify all of the lenders of offers of amendment fees. Section 9.02 of the Credit Agreement explicitly addresses how it may be amended and only requires consent of a percentage of the lenders:

> [N]either this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Holdings, the Borrower and the Required Lenders . . .<u>provided</u> that no such agreement shall . . . [lists restrictions].

(Defs.' App. 119). "Required Lenders" is a defined term meaning, "at any time, Lenders having Revolving Exposures, Term Loans and unused Commitments representing more than 50% of the sum of the total Revolving Exposures, outstanding Term Loans and unused Commitments at such time." (*Id.* at 41). Thus, the Credit Agreement explicitly allows the Defendants to amend it by obtaining the consent of the required percentage of lenders, provided that the amendment does not violate one of the restrictions. Notably, the Plaintiffs have not claimed a breach of Section 9.02.

Requiring notifications to or negotiations with all of the lenders would be adding a term that is inconsistent with this unambiguous contract. As the Defendants claim, the Credit Agreement allows them to deal with less than all of the lenders when amending the Credit Agreement. (Mot. 12-13). Requiring notice to or negotiation with all of the lenders would write this benefit out of the

contract. (*Id.*). That the Credit Agreement does not explicitly state that notice/negotiation is not required does not save this claim. *Metro. Life*, 716 F. Supp. at 1519 ("Although the indentures generally permit mergers and the incurrence of new debt, there admittedly is not an explicit indenture provision to the contrary of what plaintiffs now claim the implied covenant requires. That absence, however, does *not* mean that the Court should imply into those very same indentures a covenant of good faith so broad that it imposes a new, substantive term of enormous scope."). The presence of an integration clause[4] in the Credit Agreement and the sophistication of the parties further supports the Defendants' arguments. *Id.* at 1522 ("[C]ourts are properly reluctant to imply into an integrated agreement terms that have been and remain subject to specific, explicit provisions, where the parties are sophisticated investors, well versed in the market's assumptions, and do not stand in a fiduciary relationship with one another.").

The Court finds two recent cases particularly instructive. *In re Musicland Holding Corp.*, involved, among other claims, breach of contract and breach of the covenant of good faith and fair dealing claims with respect to an Intercreditor Agreement. 386 B.R. 428, 434 (S.D.N.Y. 2008). At issue was whether the Intercreditor Agreement authorized an amendment to the Revolving Credit Agreement to bring in a term lender. *Id.* at 434. The Intercreditor Agreement defined "Revolving Credit Agreement" as the original loan documents as they now existed or may be amended or modified. *Id.* at 432. This definition placed a restriction on the ability to amend in that the debtor's affiliates could not be made lenders. *Id.* at 432, 435. The agreement also stated that the creditors

---

[4]Section 9.06 provides, "This Agreement . . .constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof." (Defs.' App. 128).

waived notice and consented to amendments of the Revolving Creditor Agreement. *Id.* at 433, 435. The plaintiffs claimed that their expectation was that the Revolving Credit Agreement would only be amended for routine matters. *Id.* at 437. The court found that under New York law, the Intercreditor Agreement unambiguously allowed the amendment:

> While Appellants could have, and perhaps should have included language specifically restricting Wachovia's ability to incorporate a term loan into the Revolving Credit Agreement by amendment, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing."

*Id.* at 438 (quoting *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958 (N.Y. 2001)). The Court later stated, "The Intercreditor Agreement did, in fact, place a limitation on Wachovia's ability to amend the Intercreditor Agreement, indicating that the parties knew how to restrict Wachovia's ability to amend if they so desired." *Id.*

The Court went on to consider the breach of the duty of good faith and fair dealing and explained, "The duty of good faith and fair dealing is a tool of interpretation that cannot be used to rewrite a contract and impose new terms." *Id.* (citing *Metro. Life*, 716 F. Supp. at 1519). The Court recognized that the covenant may be used to fill gaps when a contract is silent. *Id.* at 439. However, the district court concluded that the Intercreditor Agreement was not silent because it permitted amendments to the Revolving Creditor Agreement and affirmed the bankruptcy court's dismissal of the claim for breach of contract and the covenant of good faith and fair dealing. *Id.* at 438-39.

In *Oppman*, the plaintiff shareholders entered a Stock Purchase Agreement and became parties to the Amended and Restated Stockholders' Agreement among the defendant and its shareholders. *Oppman v. IRMC Holdings, Inc.*, 836 N.Y.S.2d 494, at *1 (N.Y. Sup. Ct. 2007). The plaintiffs alleged that some of the defendants recommended a recapitalization plan to some of the

shareholders, which was adopted by written shareholder consent. *Id.* at *2. To effect this plan, the defendants obtained written consent to amend the Certificate of Incorporation to allow conversion of Old Series A Preferred Stock. *Id.* The amendment provided that holders of the stock who did not participate in the refinancing would have each share of their preferred stock converted into a share of Class A Common Stock. *Id.* The defendants then filed Certificates of Amendment with the Delaware Secretary of State stating that the majority consented to certain resolutions. *Id.* These resolutions set a conversion date for stockholders not participating in the refinancing, provided for automatic conversion for the non- participating stockholders, and stated that the non-participating stockholders would be given notice of the mandatory conversion (but specified that notice need not be given prior to conversion). *Id.* They also stated that non-participating stockholders would forfeit any right to receive a liquidation preference. *Id.* The plaintiffs claimed that they were not provided with the amendments until after the forfeitures of their holdings had occurred. *Id.* at *3. Among other claims, the plaintiffs brought a claim for the implied covenant of good faith and fair dealing. *Id.* at *5. The court found that the plaintiffs' rights as stockholders were governed by the Stockholder's Agreement, the Certificate of Incorporation, and By-Laws. *Id.* The Certificate of Incorporation expressly allowed the corporation to authorize shares senior to Old Series A Preferred shares if it obtained the consent of a majority of the shareholders of the Old Series A Preferred stock. *Id.* The Bylaws allowed the Board of Directors to dispose of a stockholder meeting and notice thereof and a vote of stockholders when taking action by written consent. *Id.* In compliance with this, the defendants obtained the majority written consent. *Id.* The court, stating that the implied covenant would not be used to create an obligation inconsistent with the contract, refused to imply a covenant of good faith and fair dealing. *Id.* The agreement specified how preferred stock would be issued and

did not require notice to the current preferred stockholders. *Id.*

Like the agreement in *Musicland*, the Credit Agreement at issue unambiguously allowed the Defendants to amend the Credit Agreement. That the Credit Agreement required the consent of the required lenders and placed restrictions on the type of amendments indicates that the parties knew how to place restrictions on the ability to amend. However, they did not place any restrictions on the procedure for obtaining the consent of the required number of lenders. Adding the requirement that all lenders be notified of the offer of an amendment fee would add a new term to the contract. As in *Musicland*, the Court rejects the Plaintiffs' argument that the implied covenant fills in gaps for the procedure for soliciting amendments to the Credit Agreement because here the Credit Agreement was not silent on the issue of amendments.

Similar to *Oppman*, the Credit Agreement provided for amendments by majority consent. The Court will not impose an implied covenant requiring negotiation and notice when the Credit Agreement did not require it. The Court concludes that the Plaintiffs "do not invoke an implied covenant of good faith to protect a legitimate, mutually contemplated benefit of the [Credit Agreement]; rather, they seek to have this Court create an additional benefit for which they did not bargain." *Metro. Life*, 716 F. Supp. at 1519. Because the Court agrees with the Defendants' second argument for dismissal of the implied covenant claim, the Court need not consider the Defendants' other arguments regarding the duty of good faith and fair dealing.

    4. *Evidence of Usage or Industry Practice*

Much of the Plaintiffs' Response relies on prior course of dealing and industry custom and practice. (Resp. 10-14). The Plaintiffs claim that when soliciting proposed amendments, the Defendants had generally adhered to the "Procedures for Credit Agreement Modifications" issued

by the Loan Syndications and Trading Association, Inc., which required them to notify each lender of pending modifications and furnish each lender with the proposed form of modification in advance of the deadline for consent. (*Id.* at 8). The Court need not consider this extrinsic evidence because the Credit Agreement is unambiguous. "A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissable to add to or vary the writing." *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) (citations omitted). When a contract is unambiguous, the Court will not consider parol evidence. *767 Third Ave LLC v. Orix Capital Markets, LLC*, 812 N.Y.S.2d 8, 10 (N.Y. App. Div. 2006). "[A]mbiguity does not arise from silence, but from 'what was written so blindly and imperfectly that its meaning is doubtful.'" *Nissho Iwai Europe PLC v. Korea First Bank*, 782 N.E.2d 55, 60 (N.Y. 2002).

For example, in *767 Third*, the court determined that the loan document, which made no mention of the claimed right to assignment of the mortgage, was unambiguous. *767 Third,* 812 N.Y.S.2d at 10. Because there was no ambiguity, the contract contained a merger clause, and the contract was entered into between sophisticated parties, the court would not consider evidence of industry practice or custom. *Id.*

In this case, as discussed above, the Credit Agreement explicitly and unambiguously provides for amendment by agreement of a majority of the lenders. Silence regarding how to negotiate these amendments does not create an ambiguity. Allowing extrinsic evidence of industry customs and course of dealing would contradict this right to amend with the consent of fewer than all of the lenders by requiring negotiation/notice to all of the lenders. As in *767 Third*, the parties are

sophisticated and the Credit Agreement contained a merger clause. In conclusion, the Court will not consider the Plaintiffs' extrinsic evidence in interpreting this unambiguous contract to create a right that contradicts the explicit terms of the contract. *See Gill v. Bowne Global Solutions, Inc.*, 777 N.Y.S.2d 712, 713 (N.Y. App. Div. 2004) (refusing to consider parole evidence of course of dealing in a breach of contract and implied covenant of good faith and fair dealing action because the contract was unambiguous); *Jofen v. Epoch Biosciences, Inc.*, 2002 WL 1461351, at *9 (S.D.N.Y. 2002) (finding extrinsic evidence of industry custom irrelevant because the contract was unambiguous and dismissing the implied covenant of good faith and fair dealing claim because it was inconsistent with the express terms of the contract). The Court **GRANTS** the Defendants' Motion to Dismiss the Plaintiffs' breach of contract and duty of good faith and fair dealing claims and will now turn to the Defendants' arguments with respect to the Plaintiffs' tort claims.

### D. Tort Claims

#### 1. Fraud

The Defendants move to dismiss the Plaintiffs' fraud claim arguing that it relies on silence or omissions (as opposed to affirmative misrepresentations) and that Texas law does not impose liability for silence absent a special duty to speak such as a fiduciary duty. (Mot. 20-21). The Defendants claim that because there is no special relationship between the parties, the fraud claim must fail. (*Id.* at 21). The Plaintiffs first respond by stating that they have alleged an affirmative misrepresentation. (Resp. 19). The Plaintiffs also claim that failure to disclose or silence constitutes fraud when there is a duty to disclose. (*Id.*). According to the Plaintiffs, the fiduciary relationship is only one situation out of which the duty to disclose arises, and their claim falls into one of the other situations. (*Id.* at 20).

*a. Fraud Based on an Affirmative Misrepresentation*

In Texas, an individual may base a fraud claim on either an affirmative false representation or a nondisclosure. *See Jones v. Texas Dep't of Protective & Regulatory Servs.*, 85 S.W.3d 483, 491 (Tex. App.-Austin 2002, pet. denied) (citation omitted) ("[fraud] may consist of both active misrepresentation and passive silence."); *see also Dorsey v. Portfolio Equities Inc.*, --- F.3d ----, 2008 WL 3274082, at *5 (5th Cir. 2008) (listing the elements of fraud based on both an affirmative false representation and nondisclosure). The Plaintiffs allege that their fraud claim is based on both theories. A fraud claim based on an affirmative misrepresentation consists of "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (quotations omitted).

The Plaintiffs claim that the Defendant engaged in an affirmative misrepresentation when they "lied to the Highland Funds regarding the proposed terms of the amendment made to the lenders." (Resp. 19). In support of this claim they point to their petition:

> Defendants represented to the Highland Funds that Term Lenders accepting the proposed amendment would receive a fee in the amount of 75 basis points. Defendants' representation was deliberately false. Defendants were secretly proposing an amendment fee of 125 bps to certain other Lenders. Defendants intentionally made the misrepresentations to the Highland Funds to induce the Highland Funds to refrain from consenting to the terms of the proposed amendment and to deprive the Highland Funds of the Enhanced Amendment Fee.

(Pet. §§ 55-56). Nowhere in their petition do the Plaintiffs allege that the Defendants made an affirmative representation that they would offer all of the lenders the same amendment fee. They also have not properly pled that the statement that term lenders that accepted the proposed

amendment would receive 75 bps was false *at the time it was made*. (*See* Reply 2 ("That defendants subsequently reached agreement on different terms with other lenders does not, under any reasonable or rational understanding of the English language, render the earlier offer [of 75 bps] 'a lie' or 'false.'"). The allegation, quoted above, that "Defendants' representation was deliberately false" is insufficient, particularly considering the other allegations in the petition. Earlier in their petition, the Plaintiffs recite the events surrounding the proposed amendments in chronological order. They state that on December 5, 2007, the Agent circulated the revised proposal of an increased 75 bps amendment fee. (¶¶ 30-31). Next they contend that the Highland Funds did not accept this proposal and that the Defendants were unable to secure the necessary consents. (¶¶ 33-34). Without providing a date, the Plaintiffs then claim that the Defendants offered the enhanced 125 bps behind closed doors to the other lenders. (¶ 35). While the exact time frame is vague, it appears from the petition that the Defendants made the 75 bps offer; it was rejected; and then the Defendants made the 125 bps offer to the select lenders. The Plaintiffs' Response to the Motion to Dismiss confirms this reading of the petition: "Defendants followed this practice [of circulating proposed amendments to all of the Lenders] for the first amendment, the proposed second amendment, and the revised proposed second amendment . . . Defendants, behind closed doors and <u>not</u> via Intralinks, *later* offered select lenders an Enhanced Amendment Fee." (Resp. 21 (emphasis added)). While, as discussed below, the Plaintiffs' petition may support a claim that the 75 bps offer was an incomplete disclosure or became false or misleading when the Defendants later offered an enhanced amendment fee, it does not support a claim that the 75 bps offer was false at the time it was made. Accordingly, the Court agrees with the Defendants that the Plaintiffs have not asserted a fraud claim based on an affirmative misrepresentation.

*b. Fraud Based on Failure to Disclose*

Having determined that the Plaintiffs have not asserted a fraud claim based on an affirmative misrepresentation, the Court turns to the Plaintiffs' next argument--that even if their fraud claim is characterized as a nondisclosure, the Defendants' contention that there was no duty to disclose still fails. In Texas, the Plaintiffs may state a fraud claim based on nondisclosure if they allege that "the Defendants concealed or failed to disclose a material fact that they knew [the Plaintiffs were] ignorant of or did not have the opportunity to discover, that [the Defendants] intended to induce [the Plaintiffs] to take some action by concealing or failing to disclose the material fact, and that [the Plaintiffs] suffered as a result of acting on the Defendants' nondisclosure." *Dorsey*, 2008 WL 3274082, at *5 (citing *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001)). Fraud based on nondisclosure also requires that a plaintiff demonstrate that the defendant had a duty to disclose that material fact. *Id.*

There has been a debate in Texas jurisprudence regarding whether a duty to disclose exists absent a fiduciary relationship. In *Bradford*, the Supreme Court of Texas recognized that "[s]everal [Texas] courts of appeals have held that a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression." *Bradford*, 48 S.W.3d at 755 (citations omitted). The court also acknowledged that The Restatement (Second) of Torts section 551 recognized a general duty to disclose in a commercial setting. *Id.* The court then stated, "We have never adopted section 551. But even if we were to adopt such a general duty, there is no evidence to support the jury's liability finding under the submitted jury charge." *Id.* at 756 (citation omitted). Citing this case, the Fifth Circuit Court of

Appeals, in a negligent misrepresentation case, concluded that there was no fiduciary or confidential relationship between the parties and that no duty to disclose arose. *Coburn Supply Co., Inc. v. Kohler Co.*, 342 F.3d 372, 377-78 (5th Cir. 2003). However, in two subsequent decisions, the Fifth Circuit recognized duties to disclose absent a fiduciary duty. *Rimade Ltd. v. Hubbard Enters., Inc.*, 388 F.3d 138, 143 (5th Cir. 2004) (recognizing that "a speaker making a partial disclosure assumes a duty to tell the whole truth even when the partial disclosure was not legally required."); *Lewis v. Bank of* Am., 347 F.3d 587, 588 (5th Cir. 2003) (citing *Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 586 (5th Cir. 2001) (a pre-*Bradford* case) (recognizing a duty to speak when "(1) a confidential or fiduciary duty relationship exists between the parties; or (2) one party learns later that his previous statement was false and misleading; or (3) one party knows that the other party is relying on a concealed fact and does not have an equal opportunity to discover the truth; or (4) one party voluntarily discloses some but less than all material facts, so that he must disclose the whole truth, i.e., all material facts, lest his partial disclosure convey a false impression.")

> Recognizing an inconsistency in the cases, the Fifth Circuit in *United Teachers* later stated:
>
> A reasonable jurist might well conclude, certainly after *Bradford*, that a duty to disclose exists in Texas only in the context of a confidential or fiduciary relationship. This court has so held in *Coburn*, the only Fifth Circuit case that discusses the relevant portion of *Bradford*. However, apart from *Coburn*, it would be fair to say that courts after *Bradford* (including this court) have not gotten the message, but have instead continued to find that a duty to disclose can exist in Texas absent a confidential or fiduciary relationship. (citing several cases).

*United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 566 (5th Cir. 2005). Unfortunately, the Fifth Circuit did not decide the issue because it found that the fraud claim failed on other grounds. *Id.* However, in a freshly minted opinion decided this month, the Fifth Circuit recognized a duty to disclose absent a fiduciary duty: "A duty to disclose may arise 'where one makes

a representation and fails to disclose new information that makes the earlier representation misleading or untrue.'" *Dorsey*, 2008 WL 3274082, at *5 (quoting *Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.*), 388 F.Supp. 2d 780, 788 (S.D. Tex. 2005)). Furthermore, Texas court of appeals cases have recognized a duty to disclose in contexts other than a fiduciary relationship. *See Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners,* Ltd., 237 S.W.3d 379, 385 (Tex. App.-Houston [14th Dist.] 2007, no pet.); Four *Bros. Boat Works, Inc. v. Tesoro Petroleum Cos., Inc.*, 217 S.W.3d 653, 670-71 (Tex. App.-Houston [14th Dist.] 2006, pet. denied). Based on the post-*Bradford* (and post-*Coburn*) Fifth Circuit and Texas court of appeals cases, the Court will assume that a duty to disclose may arise in four situations under Texas law: (1) when there is a "confidential or fiduciary relationship"; (2) "when one voluntarily discloses information, he has a duty to disclose the whole truth;" (3) "when one makes a representation, he has a duty to disclose new information when he is aware the new information makes the earlier representation misleading or untrue;" and (4) "when one makes a partial disclosure and conveys a false impression, he has a duty to speak." *Four Bros.*, 217 S.W.3d at 670-71; *Newby,* 388 F.Supp. 2d at 788.

The Plaintiffs do not offer a basis for the Court to find the existence of a fiduciary relationship. Instead, the Plaintiffs rely on the other three situations in which a duty to disclose arises. According to the Plaintiffs, the Defendants voluntarily disclosed the 75 bps offer and thus were bound to disclose the whole truth. (Resp. 21). The Plaintiffs argue that when the Defendants made the initial disclosure, they had the duty to supplement this information if it became false or misleading when they offered the secret new amendment fee. (*Id.*). The Court concludes that the Plaintiffs have sufficiently alleged the existence of a duty to disclose to survive the Defendants' Motion to Dismiss their fraud claims. Accordingly, the Court **DENIES** the Motion to Dismiss the fraud claims.

*2. Negligent Misrepresentation*

The Defendants next move to dismiss the Plaintiffs' claim for negligent misrepresentation.

In Texas, the elements of a cause of action for negligent misrepresentation are as follows:

> (1) the defendant's making a representation in the course of its business, or in a transaction in which it has a pecuniary interest; (2) the defendant's supplying "false information" for the guidance of others in their business; (3) the defendant's failure to exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff's suffering pecuniary loss by justifiably relying on the representation.

*Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 651 (Tex. App-Houston [14th Dist.] 2003, pet. denied) (citing *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.-Houston [14th Dist.] 1999, pet. denied) ( citing *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991))).

The Defendants argue first that this claim fails for the same reason as the fraud claim--that a negligent misrepresentation claim based on nondisclosure cannot be maintained absent a fiduciary or special relationship. For this proposition, the Defendants cite two cases. In the first case, *Fleming*, the court stated that generally a duty to disclose only arises out of a confidential or fiduciary relationship. *Fleming v. Tex. Coastal Bank of Pasadena*, 67 S.W.3d 459, 461 (Tex. App.-Houston [14th Dist.] 2002, pet. denied). However, the court also recognized that "[t]his Court has found a general duty to disclose information in arm's-length business transactions if a party makes a partial disclosure that, although true, conveys a false impression." *Id.*; *see also Jetpay Merch. Servs., LLC v. Miller*, 2007 WL 2701636, at *5 (N.D. Tex. 2007) (citing *Tr. of the Nw. Laundry & Dry Cleaners Health & Welfare Trust Fund v. Burzynski*, 27 F.3d 153, 157 (5th Cir. 1994)) (stating, in the context of a negligent misrepresentation claim, that a duty to correct a prior false or misleading statement

arises even without a special relationship); *Nazareth Int'l, Inc. v. J.C. Penney Corp., Inc.*, 2005 WL 1704793, at * 6 (N.D. Tex. 2007) (same). The second case that the Defendants cite is *Coburn*, 342 F.3d 372. As the Court has already discussed above, it will follow the Fifth Circuit and Texas court of appeals cases decided after *Coburn* that have held that a duty to disclose can arise absent a fiduciary duty.

The Defendants next contend that the Plaintiffs have failed to demonstrate any damage suffered independent of the breach of contract. (Mot. 21). The Defendants are correct that a claim of negligent misrepresentation must include an injury independent of damages for the breach of contract claim. *Cessna Aircraft Co. v. Aircraft Network, LLC.*, 213 S.W.3d 455, 467 (Tex. App.-Dallas 2006, pet. denied) (citing *D.S.A. Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663-64 (Tex. 1998)). The Plaintiffs claim that they were damaged because they did not receive the amendment fee. As this Court has already determined, and the Defendants have repeatedly argued, the Defendants have not breached the Credit Agreement and the Credit Agreement does not provide for a right to an amendment fee. (Mot. 2 ([N]othing in the credit agreement or any other agreement between plaintiffs and defendants provides for the fees."); Reply 1 ("§ 9.02 of the Credit Agreement, which expressly governs amendments, is unambiguous and does not provide plaintiffs with the 'right' to receive amendment fees . . ."); (Reply 6 ("[N]othing in the Credit Agreement entitles plaintiffs to amendment fees . . .")). Therefore, the Court concludes that the Plaintiffs' injury for the negligent misrepresentation claim does not arise from the Credit Agreement and is independent from the dismissed breach of contract claim. The Motion to Dismiss the Plaintiffs' negligent misrepresentation claim is **DENIED.**

### 3. Conspiracy to Commit Fraud

The Defendants move to dismiss the Plaintiffs' conspiracy to commit fraud claim arguing that the Plaintiffs fail to state a claim because they have not alleged facts that indicate that the Defendants participated in an underlying fraud. (Mot. 22). Once again, the Court finds that Plaintiffs have adequately pled an underlying fraud action and that their conspiracy claims are likewise adequately pled. Therefore, the Motion to Dismiss the fraud claim is **DENIED.**

### 4. Aiding and Abetting Fraud

The Defendants seek the dismissal of the Plaintiffs' aiding and abetting fraud claim. The Defendants argue that the claim fails for the same reasons as the Plaintiffs' fraud claim and that Texas law does not recognize a tort in aiding and abetting fraud that is distinct from conspiracy to commit fraud. The Court rejects the first argument because the Plaintiffs' fraud claim survives. As for the second argument, the Texas Supreme Court has declined to decide whether aiding and abetting fraud is unique from a conspiracy claim. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 n.7 (Tex. 2001). However, a Texas court of appeals court recently stated that no Texas cases support the idea that aiding and abetting fraud is a tort separate from conspiracy. *O'Kane v. Coleman*, 2008 WL 2579832, at *5 (Tex. App.-Houston [14th Dist.] 2008); *see also Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig)*, 2006 WL 3716669, at *8 & n.7 (S.D. Tex. 2006)(agreeing that Texas has not clearly recognized a cause of action for aiding and abetting common law fraud and stating that because the plaintiffs also pled conspiracy to commit fraud, the aiding and abetting claim was redundant and unnecessary). Since Texas does not recognize such a cause of action, the Plaintiffs' claim for aiding and abetting fraud is **DISMISSED.**

5. *Economic Loss*

The Defendants' final argument has been partially addressed above in Part II.D.2. They argue that the tort claims are the contract claims repled as torts and that they cannot receive exemplary damages for breach of contract claims. (Mot. 23). They further argue that when the injury is only economic loss to the subject of the contract, the action sounds in contract alone. (*Id.*). The rule on which the Defendants rely is the economic loss rule or the independent injury doctrine. Under Texas law, the economic loss rule may prevent a plaintiff from recovering in tort for purely economic loss where a contract governs the parties' relationship. *Century Prods. Co. v. Cosco, Inc.*, 2001 WL 1577607, at *2 (N.D. Tex. 2001) (Boyle, J.) (citing *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494-95 (Tex. 1991)). In determining whether the economic loss rule prohibits recovery on a tort claim, the court should look at the source of the duty that was breached as well as the nature of the party's injury. *DeLanney*, 809 S.W.2d at 494-95. If the defendant's duty to the plaintiff arises only from the contract between the parties, plaintiff's claim is usually a contractual claim only. *Id.* at 494. On the other hand, if the contract does not create the defendant's duty to the plaintiff, then the claim may sound in tort as well as in contract. *Id.* Nevertheless, "[w]hen the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract." *Id.*

Applying *DeLanney*, the Court will now consider the source of the duty and the nature of the injury. First, the Court has already determined that the Defendants' duty to disclose did not arise from the contract. Instead the duty arose because the Defendants allegedly made a partial or misleading disclosure or a disclosure that later became misleading or untrue. This duty would arise regardless of whether the parties had a contractual relationship. Second, as discussed above, the Credit Agreement never mentions or provides for an amendment fee. Therefore, the Plaintiffs' loss

is not the subject matter of the contract. In conclusion, the Court finds that because the source of the duty and the injury are independent from the contract, the economic injury rule does not apply.

### III. Conclusion

**For the foregoing reasons, the Defendants' Motion to Dismiss is GRANTED IN PART AND DENIED IN PART**. The Motion to Dismiss the breach of contract, breach of duty of good faith and fair dealing, and aiding and abetting fraud claims is **GRANTED**. The Motion to Dismiss the fraud, negligent misrepresentation, and conspiracy to commit fraud claims is **DENIED**.


SO ORDERED.

SIGNED August 27th , 2008


_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE